It's a consolidated matter. It's case number 4150084 and 4150101. Pliura Intervenors and Turner, the Commerce Commission and the Illinois Extension Pipeline Company are the parties. Now, with all the attorneys who are going to be arguing, please identify yourselves and tell me how much time you're going to be arguing. I think I know, but just to verify what the bailiff has given me to be correct information. Your Honor, Matthew Ellis Harvey, Special Assistant Attorney General, appearing before the Commerce Commission. I am using 15 minutes. All right, that's what I had written down. Thank you. Good morning, Your Honor. Good morning. Gerald Ambrose on behalf of the Illinois Extension Pipeline Company. I have asked for 10 minutes and you deserve five. Okay, thank you. And I believe that leaves Mr. Turner. Yes, Your Honor. I'm Mercer Turner from Wilmington. I'm here on behalf of the landowning intervenors, which is a collaborative effort in this appeal of the so-called Turner Intervenors and Pliura Intervenors at the Commission. Thank you. And you're doing, as I understand it, 10 minutes and then five minutes for rebuttal. Is that correct? Yes, and Mr. Ambrose's rebuttal is the final word, Your Honor. Okay, I believe I've got that. Then we're ready for Mr. Mercer Turner. Thank you. Thank you. May it please the court and counsel, good morning. It's a beautiful day in the Fourth District. We're very pleased to be here on this January day. Tom Pliura would have been here assisting with this argument, except he had one of his key employees, unfortunately, had a death yesterday of an immediate family member. So I encouraged him to stay home and attend to that, and he won't be here today. There are two points the landowners would like to make by way of oral argument here. I would encourage any questions. I've been here a few times, and the Fourth District is a very polite court. Please don't hesitate to interrupt me. I'd rather answer questions than make the two points I want to make if you do have questions. So you've always been very polite, and I would encourage that you ask questions if you have any. The first point I'd like to discuss are the facts surrounding the contention of the landowners that the certified pipeline at issue in this case is a private pipeline. The facts that establish that are that the pipeline principal dominant user is using it under a private contract arranged before the third hearing before the Illinois Commerce Commission, the one where the decision is being appealed in this case. We know who the parties were to the contract. We know that it provides exclusivity and priority to Marathon for the use and access and shipping on the SACS pipeline. We know it's long term. We know that Marathon guarantees to ship or otherwise pay a penalty under a ship or pay contract all arranged prior to the certification amendment proceeding. Just to clarify, that arrangement was not present when the original application for certification was sought? No, and it's our opinion that also supporting the privacy is the reduction in the diameter. The original certification was for a 36-inch pipeline. It's now certified as a 24-inch line. The difference seems like it's a foot, but it's really 125%. The capacity of a 36-inch pipeline is 225% greater than the capacity of a 24-inch line. The part that would be used by the public was taken away by the pipeline reduction. Originally, there were other major shippers involved. One way to determine that is to look at the provision of the early record back in 2008 when the commission sought to combine the SACS project with the Clydesdale project, which was a big diameter pipeline from Patoka to Houston that was going to be a joint venture between Enbridge and ExxonMobil. Now, that project never came about, and the combining of the two projects did not occur because the commission didn't approve it, but the commission staff did seek to do that. Later, Enbridge built a 36-inch pipeline from Pontiac to Cushing, and Enbridge has a line from Cushing to Houston. And the public demand for the original use of the SACS was satisfied with that project. That is the contention of the landowners here. The facts of the instant case before the commission in this third proceeding was that the only evidence of demand for the use of the pipeline came from Marathon. There was mention of this diminutive shipper, but I think the size of that shipper would be so small it wouldn't have an impact on any decision-making here. When did Marathon obtain its 35% interest in the Illinois Extension Pipeline Company? According to the records of the Security and Exchange Commission online and filings, it was on or about August 1, 2014, which would have been after the motion to reopen and the granting of that motion for this third proceeding. Well, my understanding then that the Illinois Extension Pipeline Company, I know it was formerly known by a different name, can obtain this certification, get the authority for eminent domain and condemnation, and then they can still sell their interest to a private oil company? That is another point why we believe this is a private pipeline rather than a public utility pipeline. Could they have sold 100% to Marathon if they wanted to? Well, they could, but they sold 35%. We believe essentially what happened here is between the contract of shipping and Marathon's infusion of capital as a 35% owner, that the original public utility certificate was essentially sold for a private use. When Marathon got its 35% interest, did it simultaneously get the two-thirds interest in shipping or filling the capacity for the pipeline? I've described most of what we know about the contract. Another reason we believe it's a private arrangement rather than public is the paper itself that the contract is contained on has not been subject to any public scrutiny. It wasn't disclosed at the Commerce Commission. What I'm getting at was the purchase of the 35% done concomitant with the wrapping up two-thirds of the capacity of the pipeline in Marathon's favor. The record doesn't suggest that. In the record, in this case, it suggests that the anchor shipping contract was made in 2012. So the provision about guaranteeing use and being given... In terms of anchor shipping contract, is that the contract with Marathon to control two-thirds of the capacity? Yes. Okay. And we believe that is evidence that this is a private arrangement and it's a misuse of the public utility law. I have a light that's on here. I'll be pleased to answer. You're good until it turns red. Okay. One of the concerns we have here is that that paper, that contract, hasn't been filed. It hasn't undergone any public scrutiny. But from the terms we do know that have been amended in the record, it is well established that there is one user, a private user, who is also part of the applicants in the case. So when the applicant is one of the shippers, I believe it's unavoidable to not reach the conclusion that it's a private shipping arrangement, which public utility law shouldn't be used to certify. Thank you very much. I'm very appreciative of this chance to make an argument here today. Okay. Thank you, Mr. Turner. You will have your rebuttal. I believe it's Mr. Ambrose. May it please the Court. Let me address your question, Justice Turner. Thank you. It's about when the capacity commitment for Marathon came into existence. Speak up, Justice. Oh, I'm sorry, Your Honor. Also, that's not a microphone. It just records. So you have to use your voice. It deceived me there. Yes, it is. Okay. I will speak up then. What I want to address is your question about when did Marathon get a committed capacity on the SACS line, which is the line we're talking about. We're not talking about anything called Clydesdale, which was an idea decades ago. It never came to anything. It has no relevance. Nor does the line to Cushing have any relevance to anything here, or the line that goes from Pontiac to Indiana called Line 78. We've been doing three or four of these lines for the last few years, so they all fit together. But in answer to your question, Marathon, by the approval of the Federal Energy Regulatory Commission, committed to taking firm capacity on the SACS line to the level of 200,000 barrels per day, which is a fair amount of capacity, but it's not the entire capacity of the line. It's only about two-thirds of the capacity of the line. There's still 90,000 barrels of capacity left on the line. Is there any limitation on the capacity they were able to contract for? Under the FERC order, which is the controlling authority in this case, even in terms of capacity, because FERC controls the terms and conditions of shipment on interstate common carrier crude oil pipelines. All due respect, my friends at the Illinois Commerce Commission, they do not have the authority to control the rates or the terms and conditions of shipment on interstate common carrier pipelines. The third district's decision in the Lakehead pipeline case said the only reason that an interstate pipeline is involved in Commerce Commission proceedings is the regulation of eminent domain power. And all we're really dealing with is, did this commission make a proper decision in, first of all, we've already decided that private companies don't have eminent domain power. What you're arguing here is that you're trying to turn a private company into a public conveyor, therefore... There is your problem. My problem? Yeah. Let me interrupt you and say, this idea that Marathon is a private shipper, the commission itself has rejected that. The commission listened to this argument that said, if you have a committed level of transportation capacity, you're a private shipper. It said we reject that. Here's the thing. You're citing federal law in support of what you want to do, and yet you didn't use federal law. You went through the commission. You used the state statute to obtain eminent domain power. Well, that's because the only way that any common carrier pipeline can obtain eminent domain authority, and by the way, as you know, this court has already sustained the grant of eminent domain authority to us by the Commerce Commission, just as it previously sustained the certification, and all we're talking about now is a change in the size of the pipe that was proposed for the project. Well, should I infer from that that the original pipe requested was not necessary for the public then? No. Because at that time it was represented you needed a 36-inch pipe. Your Honor, I know exactly where you're going, but what you're suggesting is wrong because the project is not... I'm making a lot of mistakes today. Well, you know, when I argue with you, it doesn't mean I don't respect your position, but I've got to say that that's not the way it goes. I don't have a position. I'm just trying to get down to the facts so I can understand it. Fine. Here's the point. The project that was approved was not dependent totally upon the size of the pipe. The project was designed to make movement of crude oil from production sources feasible down to the pipeline hub at Patoka, further down in southern Illinois in Marion County, which is a major connection point for the national network of interstate crude oil pipelines. From Patoka, crude oil moves south and it moves east to various refiners, including the marathon refinery in Robinson, a very important refinery. It's the movement of the oil, that transport capacity, that was really sought approval for and approved. You go back and you read this court's decision, which you were involved in, and you say in there that it's abundantly clear that there's a need for the project, there's a need for this additional capacity, there's a need for alternative routing in the pipeline system, all of which the Congress Commission found. And that's what was involved. Now, your question was, was it only because 36 or 26 or 24 that the commission made the certification? My answer is no. It's because of this broader public need. The public need, the public interest that's involved in this transportation is to supply the public in general with an adequate amount of refined petroleum products. Remember, IEPC, which is part of the Enbridge pipeline system, is a common carrier by pipeline. It's not a refiner, it's not a producer. It moves the crude oil. Now, I've got to get back to my point about Marathon. FERC, the Federal Energy Regulatory Commission, which controls the terms and conditions, says committed shipment is not private shipment. The Illinois Commerce Commission, which heard all these arguments, said committed shipment is not private shipment. And by definition, a shipper on a pipeline is not the carrier. This whole argument is misleading. Council continuously argues Marathon, Marathon, Marathon. Marathon is not the carrier. Marathon has a minority investment in the company, in the pipeline operation. What part of the involvement of Marathon wasn't before the Commerce Commission when it resolved the current issue before us? Well, the only thing that was not specifically then present was, this is 2009. Specifically, you heard Mr. Turner's argument about these new developments and what do we know, and this isn't information that was before the Commission? Yes. The information about what the project was going to do was before the Commission, and it's in your decision. It recognizes the purpose of the project is to move oil. Let me be more specific, Council. What about Mr. Turner's argument that we just heard was not correct or accurate? Well, what was not accurate is what I've been telling you. Marathon's shipments does not make SAC's pipeline a private pipeline. The FERC order controls the allocation of capacity on that pipeline. Under the FERC order, committed shippers, it could be Marathon entirely or it could be a number of them, and in fact there are two committed shippers on the pipeline. That committed shipment could be 90%, and that's still the common carriage. I'm not quite sure I'm getting to your question. According to whom? According to whom? According to FERC. Okay. And according to the common carrier law, both of the United States, the entire English judiciary, and the state of Illinois, common carriage is defined and determined by the holding out by a carrier to serve the public without discrimination. Two important points. What's the public? Well, the public is everybody, including those people who have to ship. Petroleum producers like Marathon, they're part of the shipping public. And the commission has found, this court has agreed, that that is important, meets the test for common carrier status, meets the test for grand amount of domain import. In fact, you've authorized, approved the emplacement in some of the route tracks of the 24-inch line. That's your trainer position. At any rate, this court found that IEPC had both the proper certification authority and the proper eminent domain authority, as well as a property right to be protected in that injunction. Before you run out of time, why do you want to be limited to only two-thirds of the capacity of the 300 barrel per day proposed new pipeline? Who, me? Your client. You mean IEPC? Yeah, you. No, we don't want to be limited. That's not part of your appeal? That's not part of your appeal? I thought you were arguing that the commission improperly limited you to only two-thirds, and you might want more capacity for the time, and you might want to sell more of the company to Marathon. That's not part of the appeal? You're right. That is our appeal. Our appeal is focused on, I jumped into this because of the questions that you were asking. Our appeal is from the commission's conditions on Marathon's interest, wherein they say, I'm going to run over here if you'll excuse me, but they say in these conditions, it's come out of nowhere, by the way. They're not in the record. Nobody proposed them. There's no evidence on them. The commission all of a sudden says, oh, Marathon, there can be no increase in the capacity that Marathon is able to use on the tax line. And secondly, Marathon can't increase its interest in the IEPC company, which is a separate subsidiary, separate corporation, separate corporate body, beyond a controlling authority. Our argument on that, our appeal on those two points are, first of all, preempted by FERC, by federal law, no authority for it under the commission's regulations and general authority, because it's not an issue that's available to the commission. It's all federal. And as far as the restriction on the equity ownership share, the commission has no authority to do that. It's not granted to the Congress commission. Well, I think they're going to argue you're out of time. I think they're going to argue, however, that they took your representations in making their original decision and limited you to what you had committed to. That was a 35 percent ownership and a two-thirds capacity of the pipeline. You will have rebuttals. Please, you're next. It's Mr. Harvey, I think. That's correct, Your Honor. Manuel Harvey, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. Thank you for entertaining oral argument today. I find myself responding to both Mr. Turner and Mr. Ambrose. I was told many years ago when I joined the commission that, you know, if everybody hates you, you're probably doing a good job. That's kind of like being on the bench. In our own small way, we feel as if we don't roll. In any case, the commission did do a good job with this order, and its order on reopening of December 17, 2014 should be affirmed in its entirety. With respect to arguments raised in brief by the interveners, there was substantial evidence to support the issuance of a certificate in good standing and to support the finding that the 24-inch pipeline proposal satisfies the public need. Certificates in good standing don't expire within two years. I'm going to leave that one alone. It's extensively treated in our brief. The commission correctly determined that IEPC is a common carrier by pipeline within the meaning of Section 15401. With respect to the issues raised by IEPC, I think I'll start with those because they do seem to interest the court. Mr. Ambrose indicated that federal law is controlling, and I would agree with that up to a point. Federal law governs the shipping of crude oil in the United States. However, and frankly, to be clear, IEPC didn't have to come to the Illinois Commerce Commission for any reason. If it had decided we're going to build our pipeline without resorting to eminent domain, it probably could have. How would they do that? Go around to all the landowners and there's an easement or whatever? They would be compelled to pay what the landowners were prepared to offer if they were prepared to offer anything. And I suspect that is indeed why they came to us. But having come to us and having represented to the Illinois Commerce Commission that 90,000 barrels per day of capacity would be reserved and that Marathon's ownership interest would not exceed 35 percent, and the commission having relied upon those specific statements made by the applicant, it is difficult to see how. First of all, that did not provide substantial record evidence to support those conditions on the capacity restriction and upon the restriction of increasing the ownership interest. And moreover, it's something that the commission found to be intertwined in its decision to grant authority, in this case, in the first place. The commission stated, and I'm going to try and read directly from it, that IEPC elected not to avail itself of its federal law options and instead came to the commission for relief. The commission, and these are its words, took all of the information that IEPC provided to it into consideration in making its findings. Now, we don't concede that those findings are in any way defective, unsupported by evidence, unsupported by the record, without jurisdiction. But, in the event that the court does indeed take that view, we request that we get the whole case back, in light of the fact that the commission's decision to grant authority… Well, I might read into that that the commission's decision may have been different if they were going to control, instead of 66 percent of the capacity, 80 percent or 90 percent, or had ownership and marathon at 50 percent or 51 percent. Is that fair to say? I obviously cannot divine the commission's… Well, it seems like a reasonable inference as to why the commission would take the position it does. I believe you could certainly read the commission's order precisely the way you suggested it could be read, yes. As I say, I can't stand up and tell you for a fact that the commission, in the event that some facts or circumstances were done differently… Why is it that the shipper who will have control of the 10,000 barrels per day, not identified? I believe that that information was identified as confidential because it was competitively sensitive information. That's my understanding. I don't know for a fact whether that was the, you know, whether it was a term of a contract, or whether the shipper itself was uneasy about its identity being known, but it nonetheless appears to have been marked as confidential for that reason. The pipeline says the commission doesn't have the authority to impose these conditions. What is the basis of your authority? Well, Your Honor, certainly the cases all say that the commission has prudential authority over the construction of pipelines. What was that, prudential? Prudential authority, yes. What does that mean? Well, ultimately that's for you to decide, Your Honor. Well, what does it mean to you? What is prudential, the term prudential authority? I think that it means that the commission has more authority to, in the event that it can condition its certificates to make certain that public goals, such as ensuring a public need is satisfied or a public use exists, you know, to make sure that those goals are achieved. Well, but generally speaking, it's an administrative agency. It derives its power from statute. Where does this authority come from? I'm unable to identify any specific statute that we would rely upon other than the Common Carrier by Pipeline Act generally. So your argument is that the commission is given the discretion to approve pipelines like this and as part of exercising its discretion may impose reasonable conditions to make sure the public good is ensured? I would say in a case such as this where the applicant itself has stated that specific facts and circumstances will obtain, if it is granted the authority, the commission can reasonably do precisely that. Had the pipeline not come back before the commission said we want to reduce from 36 to 24, reopening essentially the approval process, would the commission be able to hold the pipeline to the percentages that it originally had set forth the first time? I believe that the commission's original order in docket 070466 would remain in force, in fact, if that answers your question. Well, what did that docket say? Did it limit the pipeline there? I believe that the commission found that there was an adequate showing that the pipeline was indeed for a public, you know, there was a capacity reservation such that there was a public use. Had that percentage of use been exceeded under the original order? Would that have been considered a violation of the order? It presumably would have if it had been exceeded above whatever the limit was. And frankly, I am sort of bridging up from memory what I know about the original order. Could the commission have imposed this percentage use on the original order? I believe, in my opinion, Your Honor, for what it's worth, the conditions here are limited to the facts and circumstances of this order on rehearing. The fact is that the company came in and on rehearing said that we're going to reserve this capacity. And, you know, Marathon's ownership is this. And the commission took them at their word. The second time? Yes. So what these conditions are, what they said they were going to do? Certainly that's our position, Your Honor. Well. And there is record evidence of it, and I can refer you to that if it would be helpful. But essentially that's what they said the first time as well, wasn't it? Again, I'm going from memory of something that I don't entirely recall, but I think that is the case. Let me ask you the same question I asked Mr. Ambrose. As you heard Mr. Turner's argument, I'm not sure I understood it, but the gist of it seems to be that somehow the commission got hoodwinked because a bunch of stuff you don't know about in this arrangement is now out there and the commission doesn't know anything about it and shouldn't have done anything to approve this new order. Well, I devoutly hope the commission didn't get, as you say, hoodwinked. Well, what part of his argument, as I've characterized it, is mistaken? Maybe that would be the more pertinent question. Maybe the way to approach it is to sort of go back to first principles. And I think under the, you know, what the court may find pretty enlightening is something that I spent a whole lot of time, you know, banging my shoe on the table on in brief. The decision in Iowa RCO versus Commerce Commission I think really is very relevant to this. There, a committed shipper or, you know, pipeline company said that, and it was a 24-inch pipeline as I recall, and for the benefit of the court, that's reported at 86 Appellate 3rd 1116. There, the public use was found where the portion of the pipeline's capacity over and above the substantial commitment that an affiliated shipper was prepared to use, one of two committed shippers, was deemed sufficient to be a public use. This was a case where one of the two refineries that was using and had committed to the pipeline had a capacity of 127,000 barrels per day. Both of them were out of state. One of them was affiliated. Under those circumstances, capacity, which logically has to be finite if we're talking about a common carrier by pipeline, was, you know, whatever the excess capacity was over and above what two committed shippers were going to use, which seems to have been, based on the case itself, a substantial percentage of the available capacity, if not the majority, was, and if that were offered for sale, the commission found that this court affirmed was for public use. So I think Mr. Turner, well there's this Abe Lincoln story that I'll bore you with for a second. Abe Lincoln tells the story of a little, a young man who saw his sister going up to the hayloft with the higher man and he saw them take their clothes off and then he went to his father and said that they're, you know, going to do something in the hay and what he said, you know, I'm now realizing that this story is perhaps not entirely fit for court, but he said, you know, daddy, daddy, they're going to urinate in the hay. And it was an example of how somebody had all of the facts, but had not necessarily reached the right conclusions from them. And I think this is a similar case. I have no reason to dispute Mr. Turner's version of events, Mr. Ambrose may, but I don't think the conclusion he draws from that is sustainable or correct as a matter of law. Well, maybe to be more blunt, did the commission have everything before it that it needed to have to fully understand this proposal and to resolve it? I think they had everything they needed to, you know, based on their order, to determine that a certificate, subject to the conditions that the commission issued the certificate subject to, could properly issue under Section 15401 of the Common Carrier by Pipeline Act. One last question. If I understood Mr. Ambrose correctly, he was saying that the commission's action was inconsistent with some decision of the 3rd District. Are you familiar with that case and do you understand his argument and what's your response? If I took Mr. Ambrose's point correctly, and I believe he was talking about the Lakehead Pipeline decision, I think that we would argue that the holding there was somewhat less... Well, we don't have to follow it, Counsel, so my question is, is that what he was talking about and was it correct? Tell me. I think, if I recall the case correctly, that is another case that discussed prudential regulation of pipelines. And my recollection of that case, which I suspect may be infirm, is that the case suggested that this was one of... that eminent domain was, you know, fell squarely within that rubric. I'm not sure, sitting here today or standing here today, that it's limited to that. Okay, thank you, Counsel. You're out of time. Thank you very much, Your Honors. Thank you, and I believe we're back to Mr. Turner now. May it please the Court, the Lakehead case is an Enbridge case. Enbridge formerly was known as Lakehead. That's a case where they were not granted eminent domain in Illinois and built a pipeline that comes from Wisconsin and wraps around Chicago over to facilities they have south of Lake Michigan and Indiana. In that case, the control that that case refers to, that is not preempted by any federal law, is local control. The real smart people at FERC don't have any idea, generally speaking, about corn and soybean fields in rural Illinois. And the whole idea is that Illinois decisions ought to be made in Illinois and not in Washington, D.C. by an administrative agency there. In addition to that, you know, local people aren't informed of actions at FERC. None of the landowners in this case were given any notice that prior to Enbridge coming to the Commission that FERC made some decisions. This is the second time this case has been there, Counsel. We're just talking about a petition to approve for the second time with a pipeline from 34 to 26 inches. So I don't intend to relitigate the stuff from the first time. So the second time, what's the issue? How does anything you just said address the second time? I was addressing the Court's questions about Lakehead. I'm done with that. I'll move on. The third proceeding, which is the one on appeal now, the decision made December 17, 2014, that decision involved substantially more than a change in the diameter of the pipeline because there's a new applicant, there was a new purpose for the line, there was this contract guaranteeing use of it, but also providing priority access to it, which did not exist in the decision made in July of 2009. Marathon had no reason to have those contracts in place back in 2009 because there was huge capacity there and it was going to be utilized by several shippers. Counsel, how does that work? Particularly when we're talking about some heavy crude and some light crude. Some shipper gets it one day and another shipper gets it the next day? Well, my understanding is this. Now, you understand I represent farmers here, but orders are placed reserving capacity. The product of their shipping is identified and approved by Enbridge and separating it is something called a pig. And so I suppose maybe farmers are supposed to know something about this since it's a pig that separates the light from the crude oil. And it reaches a destination and heavy product goes into a heavy storage bin and light product goes into a light one. I believe the products are even commingled at times and that's simply how it works. And common carriage would be that there is no provision where somebody says I get to dominate the pipeline and use it whenever I want to. Federal law doesn't control whether it's a common carrier. Illinois law does. And Illinois law simply says it should be open to the public. Why shouldn't we trust the commission to exercise its judgment in this area with our expertise, especially given that we have not? Oh, your honor, I would want to aggressively disagree with what you just said. I think there is no one that knows more about Illinois than Illinois lawmakers, Illinois judges, Illinois landowners, the Illinois legislature, and the Illinois government. I'm talking about the Illinois legislature created the commission to deal with precisely these kinds of problems. Pipelines, should they get eminent domain, under what circumstances. They're the people who have the expertise in that. In case you missed it, we have not. Why shouldn't we trust them? Oh, I thought you were asking me why shouldn't Illinois allow FERC to make the decisions. And I believe the Illinois Commerce Commission should be entitled to certify public utilities. But when it exceeds its authority and certifies a major private use, then you don't need to know specifically how oil is transported in a pipeline, but you can determine whether their authority was exceeded, which it was in this case. Thank you very much. I appreciate your time today. Thank you. We appreciate it. And I believe we're finally down to a rebuttal by Mr. Ambrose. Where would you like me to begin? Where did the commission go wrong? The commission went wrong because, as I said before, these conditions that it is imposing on Marathon and its ability, actually, they're imposing the conditions on us, on IEPC. But what the capacity condition impedes and prevents us as a common carrier from fulfilling our duties as a common carrier. It causes us to discriminate against Marathon as a shipper because Marathon has a way… The commission says they're just doing what you guys promised. No, we did not tell the commission any time that we would never have more than 200,000 barrels from Marathon. That's a misrepresentation. We told that Marathon… What we did was inform the commission about what had happened in latest developments. Change in the pipe site, Marathon committing under the FERC authorization to have 200,000 barrels of committed capacity. We didn't say they'd never have any more because you cannot say that. As a common carrier by pipeline, somebody comes up to you, even if they're already… We can say that the commission says that's what you have to do. They're wrong. That's not right. It's not in the record. You can't be subject to federal sanctions if you're complying with the commission's order. I may have misunderstood what you asked me, Judge. No, I'm saying that if you're concerned about, gee, you have to make access to common carriers, and maybe I've understood you claim you violate federal statutes. You're not if you're in compliance with the commission directive. True, but the problem is who's going to control on an interstate common carrier pipeline? And the controlling authority is the federal law implemented by FERC. Under the Interstate Commerce Act and the Transportation Act, FERC has the exclusive jurisdiction to set rates and terms and conditions of service, and that includes capacity. Well, apparently the commission thinks otherwise and let FERC go to federal court to enforce it. That may be what actually happens ultimately in the future. Who knows? Preemption is a very tricky doctrine, counsel, and it's not easily to be inferred. I agree with you entirely. We understand that. My point is, though, that if that fight can be avoided, it ought to be. Counsel, did I understand you earlier to say that FERC would actually allow, under their guidelines, for a shipper to control 90 percent of the capacity of the pipeline? Yeah, well, Governor, let me – I keep – I don't mean to say you're wrong, but you're wrong. I keep doing that. I'm asking a question, counsel. I don't know how in the hell I can be wrong by asking a question. The premise of the question is the shipper controls the capacity of the pipeline. The shipper uses the capacity of the pipeline. The shipper doesn't determine what the movement is going to be in terms of when it's going to take place, how it's going to be done. It does not control the operation. Okay, the shipper controls 90 percent of the capacity. Is that an incorrect statement? Is that what you're saying? Yes. Okay. The shipper is allowed to commit up to 90 percent under the FERC order. The FERC order is in the record here. You can look at it. It says that you can still be a common carrier, interstate common carrier, by pipeline and have committed shipper or shippers. Could be one, could be two, could be several. Okay, so then one committed shipper could use 90 percent of the capacity, and it would have been the legislature's intent for that single company to obtain eminent domain under the Illinois statute. It's not the shipper that obtains eminent domain. It's the carrier. You've got to draw the distinction between marathons and shippers. The carrier allows the shipper to have 90 percent. In essence, my question is, doesn't that then mean that the shipper gets eminent domain over all this property, as Mr. Turns argued, from the farmers and landowners? No, it does not mean that at all. It means that the entity certificated by the commission to act as a common carrier by pipeline in regard to the exercise of eminent domain authority has the eminent domain authority. Marathon cannot go into court and condemn any private property for this pipeline. That has to be done by us. Well, if they obtain more than 35 percent, as you want them to do, they could, right? No. They would have backdoored it in. It would have been done by the original applicant, and then there's a sale later to Marathon for more than 50 percent, that in essence they then got eminent domain because the original certificate was granted by the commission. No. No? The idea that Marathon somehow bought the certificate is just wrong. Marathon, as a... It's a matter of semantics, isn't it? Why isn't the pipeline merely a surrogate of Marathon Oil under those circumstances? I'm sorry? Why isn't the pipeline merely a surrogate of Marathon Oil, just acting like some controlled corporation? No, because a 35 percent interest is not a controlling interest. How about 55? If Marathon were to acquire a controlling interest in the pipeline, and wanted to operate it and lead the shipment, we would have to go to the commission, and we've played this out, we would have to go to the commission and say, we need to transfer this certification, this authority, to Marathon. Not the Enbridge type entity, but to Marathon. The commission at that point could then evaluate two things. Are you, this new entity, whatever it might be called, is it fit, willing, and able to operate as a commentary by pipeline? And secondly, is it going to operate as a commentary by holding out to serve not just itself... So by entering the order it did, the commission avoided this problem, because Marathon can't obtain a majority. Marathon could obtain a majority. Under this order, can they? Well, right. To comply with this order, Marathon cannot obtain a majority controlling interest. And your point is excellent, because if that's the case, then it really doesn't cause a problem, because they're not going to do it. But your earlier point was the authority of the commission. We appreciate the arguments from all of you. The case is submitted, and the court stands in recess until...